IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

GEICO INDEMNITY COMPANY,

                          Plaintiff,

v.

UMIALIK INSURANCE COMPANY,

                          Defendant.

Case No. 3:20-cv-00073-TMB

ORDER ON PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT (DKT. 35) AND
DEFENDANT'S CROSS-MOTION FOR
SUMMARY JUDGMENT (DKT. 39)

## I.     INTRODUCTION

The matter comes before the Court on Plaintiff Geico Indemnity Company's ("Geico")

Motion for Summary Judgment[1] and Defendant Umialik Insurance Company's ("Umialik")

Opposition and Cross-Motion for Summary Judgment (collectively, the "Motions").[2] The Motions

were fully briefed by the parties.[3] Geico requested oral argument, which the Court granted after

directing the parties to submit supplemental briefing.[4] The Court heard oral argument on January

18, 2023.[5] For the reasons stated below, Plaintiff's Motion for Summary Judgment at Docket 35

is **GRANTED,** and Defendant's Cross Motion for Summary Judgment at Docket 39 is **DENIED.**

---

[1] Dkt. 35 (Motion for Summary Judgment).

[2] Dkt. 39 (Opposition and Cross-Motion for Summary Judgment).

[3] Dkt. 35; Dkt. 39; Dkt. 42 (Geico Reply); Dkt. 43 (Umialik Reply); Dkt. 48 (Umialik Supplement);
Dkt. 49 (Geico Supplement).

[4] Dkt. 44 (Motion for Oral Argument); Dkt. 45 (Text Order); Dkt. 47 (Minute Order); Dkt. 50
(Text Order).

[5] Dkt. 52 (Minute Entry); Dkt. 53 (Oral Argument Transcript).

1

## II.    BACKGROUND

This case involves an insurance coverage dispute between two insurers, Geico and Umialik, arising from an automobile collision (the "Collision") caused by Rebecca Maier-Sell, an Anchorage business owner. Geico seeks reimbursement from Umialik for a portion of the settlement paid to the victims of the Collision.[6]

### A.  The Collision

On December 18, 2017, Maier-Sell was driving a 2016 GMC Acadia ("GMC Acadia") while intoxicated and collided with another vehicle, injuring that vehicle's occupants, driver Duane Hunte and passenger Brandi Ropati.[7]

The GMC Acadia had been leased by Fourteen Six, LLC ("Fourteen Six"), an Alaska company;[8] both Maier-Sell and her husband Russell Sell serve as its members. At the time of the Collision, Fourteen Six was insured under an Umialik Business Auto Policy (the "Umialik Policy").[9] Maier-Sell was also insured under a personal auto liability policy issued by Geico (the "Geico Policy").[10] The GMC Acadia was specifically listed on the Geico Policy's Declarations Page but not on the Umialik Policy.[11]

---

[6] *E.g.*, *Marwell Const., Inc. v. Underwriters at Lloyd's, London*, 465 P.2d 298, 301 (Alaska 1970) (under Alaska law, if the appropriate rights are reserved, insurance companies may seek reimbursement from one another after settlement); *see* Dkt. 39 at 7.

[7] Dkt. 39-3 (Collision Report).

[8] Dkt. 39-1 at 2 (Motor Vehicle Lease) (demonstrating both Russell Sell's and Rebecca Maier-Sell's signature on the lease agreement).

[9] Dkt. 5-3 at 50–126 (Complaint).

[10] *Id.* at 19–49.

[11] *Id.* at 19 (Geico Declarations Page), 51 (Umialik "SCHEDULE OF COVERED AUTOS YOU OWN").

2

*B. Coverage Negotiations, Mediation, and Settlement*

In early 2019, Hunte and Ropati filed suit in Alaska Superior Court seeking damages related to the Collision.[12] In initial communications between Geico and Umialik, an Umialik adjuster determined that Umialik would not provide "coverage for this incident," but would still continue to work with the involved parties.[13] As the two insurers continued to communicate, Umialik changed its position, stating, "[W]e determined we will extend coverage as requested."[14] However, two days before the scheduled mediation, Umialik notified Geico that "it was disputing coverage but would attend the mediation in good faith."[15]

Despite Umialik's dispute of coverage, both Geico and Umialik agreed to proceed with mediation while reserving certain rights between themselves, including the right to contest whether Maier-Sell was covered under the Umialik Policy.[16] In addition to discussing whether Maier-Sell was insured under the Umialik Policy, Geico and Umialik also discussed how they might apportion

---

[12] Dkt. 5-3 at 3; Dkt. 7 at 2 (Amended Answer).

[13] Dkt. 35-2 at 3 (Umialik Letter) (denying coverage); Dkt. 35 at 5–6; Dkt. 39 at 1–2. Geico does not dispute its own coverage of Maier-Sell. *See, e.g.*, Dkt. 35 at 3–5.

[14] Dkt. 35-4 (Umialik email) (extending coverage); Dkt. 35 at 6; *see also* Dkt. 35-7 at 4–6 (Davis Deposition); *but see* Dkt. 39 at 2. Although Umialik does not explicitly acknowledge in its briefing that it changed its position regarding coverage, the exhibits submitted at summary judgment confirm Umialik's vacillating position on this issue.

[15] While Geico and Umialik dispute the significance of their pre-mediation communication, they do not dispute the content of the communication, nor that it occurred. Dkt. 35-9 at 2, 4 (Umialik Email) (denying coverage); Dkt. 39 at 2; Dkt. 35 at 11.

[16] Geico stated concern that "that abandoning the scheduled mediation could expose Ms. Maier-Sell to excess liability and could constitute bad faith on its part." Umialik clarified that it "was not dropping coverage defenses as to GEICO" and that it was always Umialik's position that "the GEICO policy [was] the only source of insurance coverage available" to Maier-Sell. Dkt. 35 at 12; Dkt. 39 at 4–5; Dkt. 5-3 at 5; Dkt. 7 at 3; *see also* Dkt. 27-1 at 6 (Davis Affidavit).

3

the claims against Maier-Sell between them. They did not come to an agreement before mediation.[17]

At mediation the parties settled all claims, agreeing that Hunte would receive $207,500 and that Ropati would receive $100,500.[18] Geico paid $112,500 to Hunte, with Umialik issuing the remaining $95,000.[19] Geico also paid the entire Ropati settlement.[20]

### C. Procedural History

With both parties having reserved their rights to contest coverage after settlement, Geico filed its Complaint in Alaska Superior Court.[21] On March 25, 2020, Umialik removed the case to the United States District Court of Alaska based on diversity jurisdiction.[22]

On June 29, 2022, after the parties completed discovery, Geico filed a Motion for Summary Judgment seeking to recover $161,666.67 from Umialik.[23] Geico states that this amount is based

---

[17] Dkt. 35-7 at 7 (in her deposition, Umialik's claims representative stated that she did not recall whether Umialik or Geico agreed to pro rata or excess division of a settlement); Dkt. 35 at 9–10; Dkt. 35-9 at 4 (Umialik stated that it "may be willing to consider the potential exposure into its policy as an excess carrier for its insured Fourteen Six LLC" despite having denied coverage).

[18] Dkt. 35 at 12; Dkt. 39 at 5; Dkt. 5-3 at 5; Dkt. 7 at 3.

[19] Umialik states that it paid a portion of the settlement to "protect the insureds [Fourteen Six]." Dkt. 53 at 10; Dkt. 35 at 12.

[20] Dkt. 35 at 12; Dkt. 5-3 at 6; Dkt. 7 at 3. At oral argument, Geico stated that it paid both settlements in accordance with its $100,000 per-person policy limit. Geico clarified that it covered an additional sum ($500 in the case of Ropati and 12,500 in the case of Hunte) pursuant to Alaska law. *See* Dkt. 53 at 3–4.

[21] Dkt. 1 at 4–22 (Notice of Removal).

[22] *Id.* at 1–3; *see* 28 U.S.C. §§ 1332 and 1441(b).

[23] *See generally* Dkt. 35.

4

on Umialik's pro rata share of the Ropati and Hunte settlements ($308,000).[24] In support of its claim, Geico asserts that Maier-Sell is an insured under Umialik's insurance policy and, as such, Umialik should have paid for a higher percentage of the Hunte and Ropati settlements.[25] In the alternative, Geico claims that Umialik is liable for a pro rata portion of the settlement based on the theories of negligent misrepresentation and promissory estoppel.[26]

On July 20, 2022, Umialik filed an Opposition and Cross-Motion for Summary Judgment, contending that since "Geico's declaratory judgment action requires resolution of the coverage and priority questions one way or the other," the Court should find Maier-Sell was not an insured for the purposes of the Collision.[27] Alternatively, Umialik contends that if "the [Umialik Policy] coverage does apply to [Maier-Sell], the apportionment of the mediation should remain in place."[28]

On August 9, 2022, Geico filed a consolidated Reply and Opposition.[29] Umialik then filed its Reply and Opposition, and the Court took the Motions under advisement.[30] The Court granted

---

[24] Geico claims that it paid more than it should have when it paid a pro rata share of both settlements, $112,500 to Hunte and $100,500 to Ropati. Dkt. 35 at 12, 36–37.

[25] Dkt. 35 at 21–25.

[26] Dkt. 35 at 25–29.

[27] Dkt. 39 at 3.

[28] Although Umialik did not expressly extend coverage to Maier-Sell before mediation, this payment amount implies that Umialik acted as an "excess" insurer since Umialik only contributed to the settlement after Geico had met its per-person liability limit. *See id.* at 3.

[29] Dkt. 42.

[30] Dkt. 43.

Geico's request for oral argument and later directed the parties to file simultaneous supplemental briefing.[31] Oral argument was held on January 18, 2023.[32]

D. *The Contractual Provisions at Issue*

At the time of the Collision, Maier-Sell was a named insured under a personal auto liability policy issued by Geico.[33] Fourteen Six was a named insured under a Business Auto Policy issued by Umialik.[34] The relevant provisions in each policy are included in the following subsections.

1. The Geico Policy Coverage

Section 1 of the Geico Policy outlines its liability coverage for Maier-Sell:

> **LOSSES WE WILL PAY FOR YOU UNDER SECTION I**
>
> Under Section I, subject to EXCLUSIONS, we will pay damages up to the applicable policy limits stated on the declarations pages, other than punitive and exemplary damages, which an ***insured*** becomes legally obligated to pay because of:
>
> 1. ***bodily injury***, sustained by a person, including all injuries and damages to others sustained in the same accident, and;
>
> 2. damage to or destruction of property, arising out of the ownership, maintenance or use of the ***owned*** auto or ***non-owned*** auto. We will defend any suit for damages payable under the terms of this policy. We may investigate and settle any claim or suit.[35]

Key terms in this policy are: (1) "owned auto" and (2) "non-owned auto." Geico defines an "owned auto" to mean "a vehicle described in this policy for which a premium charge is shown

---

[31] Dkt. 44; Dkt. 47; Dkt. 48; Dkt. 49.

[32] Dkt. 44; Dkt. 45.

[33] Geico Policy Number 4089-72-03-22. *See* Dkt. 5-3 at 19–49.

[34] Umialik Policy Number CPP 1103157 03. *See id.* at 50–126.

[35] *Id.* at 24 (emphasis in original).

6

for these coverages."[36] A non-owned vehicle is "a *private passenger auto*, *farm auto*, *utility auto*, or *trailer* not owned by or furnished for the regular use of either *you* [Maier-Sell], a member of *your* household, or a *relative*, other than a temporary substitute auto. An auto rented, leased, or borrowed for more than 30 days will be considered as furnished for regular use.[37]

Geico provides a liability coverage limit of $100,000 per person and $300,000 per occurrence.[38]

### 2. The Umialik Policy Coverage

The Umialik Policy outlines its liability coverage for Fourteen Six under Section II of its Business Auto Coverage Form.[39] This section defines the scope of coverage:

> We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto".[40]

Umialik defines the term "insured" as:

  a. You [Fourteen Six][41] for any covered "auto".

  b. Anyone else while using with your permission a covered "auto" you own, hire or borrow except:

   i. The owner or anyone else from whom you hire or borrow a covered "auto".

---

[36] *Id.* at 23.

[37] *Id.* (emphasis in original).

[38] *Id.* at 19, 24.

[39] *See id.* at 66–70; *see generally id.* at 50–126.

[40] *Id.* at 66.

[41] "You" is defined as "the Named Insured shown in the Declarations," which is listed in the policy as "FOURTEEN SIX LLC DBA SKIAK." *Id.* at 50.

7

      ii.  Your "employee" if the covered "auto" is owned by that "employee" or a member of his or her household.

     iii.  Someone using a covered auto while he or she is working in a business of selling, servicing, repairing, parking or storing "autos" unless that business is yours.

     iv.  Anyone other than your "employees", partners (if you are a partnership), members (if you are a limited liability company) or a lessee or borrower or any of their "employees", while moving property to or from a covered "auto".

     v.  A partner (if you are a partnership) or a member (if you are a limited liability company) for a covered "auto" *owned* by him or her or a member of his or her household.

  c.  Anyone liable for the conduct of an "insured" described above but only to the extent of that liability.[42]

Umialik defines "Covered Autos" with a table of "numerical symbols" that describe which type of vehicles are "covered" under Fourteen Six's policy.[43] The Umialik Business Auto Declaration clarifies that Fourteen Six's policy applies to "Covered Auto Symbols" 7, 8, and 9.[44] These symbols are defined as follows:

    7. **Specifically Described "Autos":** Only those "autos" described in Item Three of the Declarations for which a premium charge is shown (and for Covered Autos Liability Coverage any "trailers" you don't own while attached to any power unit described in Item three).

    8. **Hired "Autos" Only:** Only those "autos" you lease, hire, rent or borrow. This does not include any "auto" you lease, hire, rent or

---

[42] *Id.* at 66–67.

[43] *Id.* at 65 ("The following numerical symbols describe the 'autos' that may be covered 'autos'. The symbols entered next to a coverage on the Declarations designate the only 'autos' that are covered 'autos'.").

[44] *Id.* at 50 ("'Autos' are shown as covered 'autos' for a particular coverage by the entry of one or more of the symbols from the Covered Autos Section of the Business Auto Coverage Form next to the name of the coverage.").

borrow from any of your "employees", partners (if you are a partnership), members (if you are a limited liability company) or members of their households.

9. **Non-owned "Autos" Only:** Only those "autos" you do not own, lease, hire, rent or borrow that are used in connection with your business. This includes "autos" owned by your "employees", partners (if you are a partnership), members (if you are a limited liability company) or members of their households but only while used in your business or your personal affairs.[45]

The Umialik Policy provides a liability coverage limit of $1,000,000 per accident.[46]

3. <u>The Geico Policy's "Other Insurance" Section</u>

The Geico and Umialik policies both contain "Other Insurance" sections. These sections clarify the division of liability when there are two or more insurance companies that cover the same claim. In other words, the "Other Insurance" provision states how much each insurer must pay in the case of a settlement. The Geico "Other Insurance" section states:

If the ***insured*** has other insurance against a loss covered by Section I [the liability coverage provisions] of this policy, we will not owe more than our pro-rata share of the total coverage available.

This policy is excess over any other valid and collectible primary insurance that applies to ***a temporary substitute auto*** or ***non-owned auto***. If there is other valid and collectible excess insurance, we will not owe more than our pro-rata share of the excess coverage available. If, however, the ***temporary substitute auto*** or ***non-owned auto*** is a rented motor vehicle, this policy provides primary coverage.[47]

---

[45] *Id.* at 65 (emphasis added).

[46] *Id.* at 50.

[47] *Id.* at 26 (emphasis in original), 23.

For reference, a temporary substitute auto is defined as a vehicle that is "not owned by [the insured], temporarily used with the permission of the owner. This vehicle must be used as a substitute for the ***owned auto*** . . . because of its breakdown, repair, servicing, loss or destruction."[48]

### 4. The Umialik Policy's "Other Insurance" Section

The Umialik "Other Insurance" provision states:

> For any covered "auto" you own, this Coverage Form provides primary insurance. For any covered "auto" you do not own, the insurance provided by this Coverage Form is excess.[49]

## III.    LEGAL STANDARD

Summary judgment is appropriate where, when viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party,[50] "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[51] Material facts are those which might affect the outcome of the case.[52] A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."[53]

---

[48] *Id.* at 23.

[49] *Id.* at 77.

[50] *Scott v. Harris*, 550 U.S. 372, 378 (2007).

[51] Fed. R. Civ. P. 56(a). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[52] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

[53] *Id.* at 248.

A movant's burden may be met by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."[54] Once a movant has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify facts which show a genuine issue for trial.[55] "[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them."[56] In a diversity action, the Court must apply the substantive law of the forum state—here, Alaska.[57]

## IV. ANALYSIS

Geico moves for summary judgment, asserting that because Maier-Sell was an insured under the Umialik Policy, Umialik should reimburse Geico for a pro rata share of the Hunte and Ropati settlement.[58] In the alternative, Geico argues that even if Maier-Sell were not covered under the Umialik Policy, Umialik is still liable under (1) the tort of negligent misrepresentation and (2) the doctrine of promissory estoppel.[59]

---

[54] *Celotex Corp.*, 477 U.S. at 325.

[55] *Id.* at 323–24.

[56] *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001).

[57] *Cf. In re Exxon Valdez*, 484 F.3d 1098, 1100 (9th Cir. 2007) (quoting *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938)); *see, e.g.*, Dkt. 35 at 19; Dkt. 7 at 32; *Allstate Insurance Co. v. Falgoust*, 160 P.3d 134, 138 (Alaska 2007).

[58] Dkt. 35 at 4–5.

[59] *Id.* at 4, 25–31.

Umialik cross-moves for summary judgment, contending that Maier-Sell is not an insured under the Umialik Policy.[60] Umialik also challenges both of Geico's alternative liability arguments.[61] In the alternative, Umialik asserts that even if the Court were to find the Umialik Policy covers Maier-Sell, it would only be "excess" to the Geico Policy's primary coverage.[62] Because the material facts are undisputed and this case's resolution requires the Court to determine two questions of law, it is appropriate for the Court to resolve this case at summary judgment.[63]

In addressing the parties' arguments, the Court first considers the threshold question of whether Maier-Sell is an insured as defined by the Umialik Policy. For the reasons described below, the Court concludes that Maier-Sell qualifies as an insured for the purposes of the Collision. Because the Court finds that Maier-Sell is an insured under the Umialik Policy, it declines to consider Geico's alternative bases for recovery—negligent misrepresentation and promissory estoppel.

The Court next turns to the way in which the Hunte and Ropati settlements should be divided between Umialik and Geico. After reviewing the relevant insurance policy provisions, the Court concludes that a pro rata settlement division is required under Alaska law.

A. *Whether the Umialik Policy Covers Maier-Sell for the Purposes of the Collision*

The core dispute in this litigation is whether Maier-Sell is an insured under the Umialik Policy. Geico contends that "Umialik is liable to Geico under the terms of Umialik's policy

---

[60] Dkt. 39 at 2–3.

[61] *Id.* at 10–14.

[62] *Id.* at 1–3.

[63] *See* Dkt. 28 (Joint Status Report) ("Both parties believe this case should be fully resolved through summary judgment, as the central issues are matters of law involving insurance interpretation.").

because Ms. Maier-Sell was an 'insured' for purposes of the accident at issue."[64] Umialik disagrees.[65] To resolve this issue, the Court must interpret the terms of the Umialik Policy.

    1. <u>Interpretation of Insurance Agreements Under Alaska Law</u>

When interpreting insurance policies, Alaska courts look to: (1) the language of the disputed provisions in the policy; (2) other provisions in the policy; (3) extrinsic evidence; and (4) case law interpreting similar provisions.[66] Insurers are typically obligated to cover the claims of insured parties according to the terms of their policies.[67]

Insurance policies are construed according to the doctrine of "reasonable expectations," which provides that the "objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations."[68] This is an objective analysis in which courts interpret an insurance policy as an ordinary person of average intelligence and experience would understand it.[69] The court looks to the plain language of the disputed policy provisions and, if needed, may look to outside sources or relevant case law.[70] In undertaking this

---

[64] Dkt. 35 at 4.

[65] Dkt. 39 at 14–16.

[66] *State Farm Mut. Auto. Ins. Co. v. Houle*, 269 P.3d 654, 657-58 (Alaska 2011) (quoting *Allstate Ins. Co. v. Teel*, 100 P.3d 2, 4 (Alaska 2004)).

[67] *Bering Strait Sch. Dist. v. RLI Ins. Co.*, 873 P.2d 1292, 1294 (Alaska 1994).

[68] *Id.* at 1294–95 (quoting 6B J. Appelman, *Insurance Law and Practice* § 4254, at 24–25 (Buckley ed. 1979)).

[69] *Jarvis v. Aetna Cas. & Sur. Co.*, 633 P.2d 1359, 1363 (Alaska 1981).

[70] *Stordahl v. Gov't Emp. Ins. Co.*, 564 P.2d 63, 66 (Alaska 1977).

13

analysis, courts will find that ambiguity exists "only when the contract, taken as a whole, is *reasonably* subject to differing interpretations."[71]

    2.  <u>The GMC Acadia is a "Covered Vehicle" Under the Umialik Policy</u>

The Umialik Policy provides liability coverage for any "insured" that has a claim "resulting from ownership, maintenance or use of a covered 'auto.'"[72] Thus, Maier-Sell's status as an insured under the Umialik Policy depends on whether the GMC Acadia qualifies as a "covered vehicle" under this policy.[73]

The Umialik Business Auto Declaration clarifies that the Umialik Policy applies to the "Covered Auto Symbols" of 7, 8, and 9.[74] Symbol 7 states that "Specifically Described 'Autos'" in Item Three of the Declarations qualify as "covered 'autos.'"[75] Symbol 8 states that a "covered auto" may be a "Hired 'Auto,'" which includes "those 'autos' you lease, hire, rent, or borrow."[76] This symbol excludes any "autos" that an insured leases, hires, rents, or borrows from any

---

[71] *Dugan v. Atlanta Cas. Companies*, 113 P.3d 652, 655 (Alaska 2005) (emphasis in original) (quoting *U.S. Fire Ins. Co. v. Colver,* 600 P.2d 1, 3 (Alaska 1979)).

[72] Dkt. 5-3 at 66.

[73] Dkt. 35 at 4; Dkt. 39 at 21–25.

[74] Dkt. 5-3 at 50 ("'Autos' are shown as covered 'autos' for a particular coverage by the entry of one or more of the symbols from the Covered Autos Section of the Business Auto Coverage Form next to the name of the coverage.").

[75] *Id.* at 65.

[76] *Id.*

employees, other members, if a limited liability company, or family members.[77] Symbol 9 is not relevant in this case.[78]

Geico argues that the plain language of the Umialik Policy indicates that Maier-Sell, a member of Fourteen Six, is an "insured" because the leased GMC Acadia is a "covered vehicle" under Symbol 8 of the Umialik Policy.[79] Umialik disagrees for two reasons.[80] First, Umialik counters that the GMC Acadia's absence in the "Specifically Described 'Autos'" section means the GMC Acadia is not a "covered vehicle" under Symbol 7, which precludes the GMC Acadia from coverage under Symbol 8.[81] Second, Umialik contends that the GMC Acadia does not fit within Symbol 8's coverage because the leased GMC Acadia was "for all intents and purposes, an owned auto for purposes of underwriting."[82] Although Umialik recognizes that insurance contracts must be interpreted under the reasonable expectations of the insured,[83] Umialik argues that because Fourteen Six "registered [the GMC Acadia], insured it as their own personal owned vehicle under

---

[77] *Id.*

[78] *Id.*

[79] Dkt. 35 at 22.

[80] *See generally* Dkt. 39 at 14–16.

[81] In support, Umialik refers to certain cases that assess whether Symbol 7's language provided insurance coverage. *E.g.*, *N. Carolina Farm Bureau Mut. Ins. Co. v. Jarvis*, 780 S.E.2d 759 (N.C. Ct. App. 2015); *Grange Ins. Co. v. Steve Tolley & Pam Nelson Joint Venture*, 547 F.Supp.3d 780 (E.D. Tenn. 2021).

[82] Dkt. 39 at 16.

[83] Dkt. 53 at 16–17.

GEICO's coverage, and treated it as owned," the GMC Acadia is actually a "de facto owned auto" and "leased in name only."[84]

In consideration of the plain language of the Umialik Policy and the Umialik Business Auto Declaration, the GMC Acadia is a "covered auto" under Symbol 8 of the Umialik Policy. Although Umialik is correct that the plain language of Symbol 7 excludes coverage for the GMC Acadia because it was not listed specifically in the policy, Symbol 8's plain language *does* include the GMC Acadia as a "covered auto" because it was a leased vehicle.[85] The Umialik Policy does not have any language that requires Symbols 7, 8, and 9 to be construed interdependently, nor does the Umialik Policy contain language suggesting that the exclusion of coverage under Symbol 7 precludes coverage under Symbols 8 or 9 when a vehicle satisfies the requirements of *those* symbols. It would defy the reasonable expectations of a lay person to interpret the Umialik Policy in such a way.

Moreover, the cases Umialik cites in support of the proposition that a vehicle's exclusion under Symbol 7 precludes its coverage under Symbols 8 or 9, are non-binding and involve dissimilar key facts. These proffered cases, from the Eastern District of Tennessee and the North Carolina Court of Appeals respectively, consider whether an insurer's coverage applies when the

---

[84] *Id.* Umialik also appears to make a policy-driven argument, implying that Fourteen Six's failure to list the GMC Acadia on the Umialik policy constitutes a "'free rider' problem that's led many states, including Alaska, to prohibit the practice," and is barred by Alaska Statute 28.20.445(d)(1). Dkt. 39 at 14. Because the parties do not allege that Maier-Sell violated said statute and the record does not reflect that Maier-Sell intentionally excluded the GMC Acadia from the Umialik Policy, the Court declines to consider this argument.

[85] The parties do not dispute that the GMC Acadia was leased by Fourteen Six. *See* Dkt. 35 at 5; Dkt. 39 at 1; Dkt. 39-1; Dkt. 39-2 (Title and Registration).

insureds in question are covered *only* under Symbol 7.[86] Here, in contrast, there are three symbols that independently confer coverage to certain autos within the Umialik Policy. As a result, neither case is applicable here.

Finally, the Umialik Policy is devoid of any language that contemplates the notion of a "de facto owned" vehicle. To give credence to this type of argument, and thereby convert a leased vehicle into a constructively owned vehicle, would violate the objectively reasonable expectations of an insured person and the plain language of the Umialik Policy. Furthermore, Umialik fails to cite any extrinsic evidence or case law that stands for the proposition that a leased vehicle may be excluded from coverage as a "de facto owned vehicle."[87]

Accordingly, the reasonable expectations of a lay person require that the GMC Acadia be considered a "covered auto" under the Umialik Policy. Thus, for purposes of the Collision, Maier-Sell is an insured under the Umialik Policy. The Court need not consider the merits of Geico's two alternative theories of recovery—negligent misrepresentation and promissory estoppel—and next considers how liability should be divided between the two insurers.

### B. *Whether the Court Should Apply a Pro Rata or Excess Division of the Settlements*

Because Maier-Sell and the GMC Acadia are covered under the Geico and Umialik insurance policies, the final issue at summary judgment is how the Hunte and Ropati settlements should be divided between the two insurers.

There are two ways in which the Hunte and Ropati settlements may be divided: through (1) a pro rata or (2) an excess coverage apportionment. A pro rata calculation proportionately

---

[86] *Grange Ins. Co. v. Steve Tolley & Pam Nelson Joint Venture*, 547 F.Supp.3d 780 (E.D. Tenn. 2021); *N. Carolina Farm Bureau Mut. Ins. Co. v. Jarvis*, 780 S.E.2d 759 (N.C. Ct. App. 2015).

[87] Dkt. 39 (absence); Dkt. 38 (absence).

divides a settlement between two or more insurers, as determined by each insurer's coverage limits.[88] For example, the total insurance coverage available to Maier-Sell was $1.2 million (Geico's applicable coverage limit of $100,000 per person, plus Umialik's $1 million policy limit).[89] Since Umialik's $1 million limit is 83.3% (5/6th) of the total available coverage, its pro rata share of the Hunte and Ropati settlement is also 83.3%, while Geico's is the remaining 16.7% (1/6th).[90] Under this scenario, Geico would be responsible for $51,333.33 and Umialik would be responsible for $256,666.67 of the total settlement.[91]

In contrast, excess coverage covers any amount that goes beyond the primary policy's coverage limit. An excess insurance policy covers a claim *only after* the primary insurance limit has been exhausted.[92] For example, the Collision's total settlement was $308,000.[93] Since Geico's policy limit is $200,000 ($100,000/person) for the Collision, Geico would pay up to this limit and Umialik would owe the remaining $108,000 to satisfy the settlement total.

---

[88] *See generally What Is the Pro Rata Condition of Average on an Insurance Claim?*, INVESTOPEDIA (Sept. 21, 2021), https://www.investopedia.com/ask/answers/042015/what-pro-rata-condition-average-insurance-claim.asp.

[89] Geico calculates its total coverage limit as $200,000 because it has a "bodily injury" limit of $100,000 per person and two people (Hunte and Ropati) made personal injury claims. Dkt. 35 at 36; Dkt. 5-3 at 19, 24, 50.

[90] Dkt. 35 at 36–37; Dkt. 42 at 12.

[91] Dkt. 35 at 36–37. Umialik and Geico appear to agree on this calculation. *See* Dkt. 53 at 17.

[92] *Understanding Insurance vs. Excess Insurance vs. Reinsurance*, INVESTOPEDIA (June 22, 2021), https://www.investopedia.com/articles/personal-finance/081116/insurance-excess-insurance-and-reinsurance-whats-difference-all.asp.

[93] This calculation is: the Hunte settlement ($207,500.00) plus the Ropati settlement ($100,500.00). Dkt. 5-3 at 5; Dkt. 7 at 3; Dkt. 35 at 12; Dkt. 39 at 5.

18

In order to determine the appropriate division of liability between the parties, the Court must interpret both insurers' "Other Insurance" Sections and assess how these provisions should be interpreted under Alaska law. As explained below, because Geico and Umialik's respective "Other Insurance" Sections conflict, Alaska law requires the Court to apply a pro rata calculation.

1. Under Geico's "Other Insurance" Provision, Geico is Liable for a Pro Rata Apportionment

The Geico Policy's "Other Insurance" Section states:

> If the **insured** has other insurance against a loss covered by Section I [the liability coverage provisions] of this policy, we will not owe more than our pro-rata share of the total coverage available. This policy is excess over any other valid and collectible primary insurance that applies to a **temporary substitute auto** or **non-owned auto**. If there is other valid and collectible primary insurance that applies to a **temporary substitute auto** or **non-owned auto** is a rented motor vehicle, this policy provides primary coverage.[94]

This provision clarifies that if the vehicle is "owned," then Geico will cover "a pro-rata share of the total coverage."[95] If the vehicle is "non-owned" or a "temporary substitute auto," then the Geico Policy is excess.[96]

Geico defines an "owned auto" as: "[A] vehicle described in this policy for which a premium charge is shown for these coverages."[97] Geico defines a "non-owned auto" as: "[A] **private passenger auto, farm auto, utility auto,** or **trailer** not owned by or furnished for the regular use of either [the insured], a member of [the insured's] household, or a relative . . . ."[98]

---

[94] Dkt. 5-3 at 26 (emphasis in original).

[95] *Id.*

[96] *Id.*

[97] *Id.* at 23.

[98] *Id.*

19

Geico asserts that the GMC Acadia is an "owned auto" under its policy because it is listed in the Geico Policy Declarations and because Maier-Sell paid a premium charge for the insurance coverage over this leased vehicle.[99] Umialik disagrees, arguing that the GMC Acadia is instead a "non-owned auto" under the Geico Policy because Maier-Sell "furnished [the auto] for [] regular use."[100]

Umialik's analysis contradicts the plain language of a "non-owned auto" as defined under the Geico Policy. The Geico Policy's definition expressly contemplates vehicles that are either *not* owned or *not* furnished for regular use by the insured to be "non-owned."[101] The Geico Policy also clearly demonstrates that Maier-Sell listed the vehicle for premium coverage;[102] therefore, the GMC Acadia is an "owned" vehicle under the Geico's Policy. Since the GMC Acadia is "owned," Geico is liable for a pro rata share of the total coverage available for purposes of the Collision.

2. Umialik is Liable as an Excess Insurer Under Its "Other Insurance" Provision

In contrast, under the Umialik Policy the GMC Acadia is not considered an "owned" vehicle.[103] The Umialik "Other Insurance" Section states: "For any covered 'auto' you do not own, the insurance provided by this Coverage Form is excess over any other insurance."[104] Because the Umialik Policy does not specifically define the term "owned," the Court interprets this word by its

---

[99] Dkt. 35 at 32.

[100] Dkt. 39 at 16–17.

[101] Dkt. 5-3 at 23.

[102] *Id.* at 19, 23.

[103] *See* Dkt. 35 at 32–33. Dkt. 39 at 16–15.

[104] *Id.* at 77.

plain meaning.[105] Consequently, the leased GMC Acadia is not an owned vehicle under the Umialik Policy and under its terms Umialik's coverage is excess.

Because Geico covers a pro rata share of the claims against Maier-Sell and Umialik provides only excess—covering the settlement only after Geico's policy limits have been fully exhausted—these contractual provisions conflict. Consequently, the Court must apply Alaska law to determine how to apportion liability.

3. <u>The Court Must Apply a Pro Rata Calculation to Determine the Insurers' Liability</u>

Geico and Umialik agree that when two "Other Insurance" Sections directly conflict they are mutually unenforceable and the Court must apply a pro rata share based on relevant policy limits.[106] However, the parties disagree as to whether the two sections conflict.[107]

In *Werley v. United Services Automobile Association*,[108] the Alaska Supreme Court assessed how different insurance coverages applied to the claims arising out of a car accident.[109] There, an insurance clause issued to a vehicle owner stated that its coverage would be applied on a pro rata basis, while the vehicle driver's insurance policy provided excess coverage.[110] The court,

---

[105] *Compare Own*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("To rightfully have or possess as property; to have legal title to."), *with Lease*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A contract by which a rightful possessor of real property conveys the right to use and occupy the property in exchange for consideration . . . .").

[106] Dkt. 35 at 31; Dkt. 39 at 17.

[107] Dkt. 35 at 35; Dkt. 39 at 17–18.

[108] 498 P.2d 112 (Alaska 1972).

[109] *Id.* at 114.

[110] *Id.*

relying on *Lamb-Weston, Inc. v. Oregon Automobile Insurance Company*,[111] concluded that when one insurer provides pro rata coverage and the other insurer provides excess coverage, they are in conflict.[112] The *Werley* court reasoned that "whether one policy uses one clause or another, when any two insurer's policies conflict "regardless of the nature of the clause, they are in fact repugnant and each should be rejected in toto."[113] The court concluded that this rationale "should be applied in all cases where conflicting 'other insurance' clauses of the excess [or] pro rata . . . types are found."[114]

Geico argues that this case mirrors both *Werley* and *Lamb-Weston* because Geico requires pro rata coverage and Umialik requires excess coverage.[115] In disagreement, Umialik argues that this case is akin to *Providence Washington Insurance Company of Alaska v. Alaska Pacific Assurance Company*.[116] In *Providence*, the Alaska Supreme Court held that because the "Other Insurance" Section in one insurance policy required a policy act as primary insurance and the other applicable insurance policy required it to be excess, there was no conflict between them.[117]

---

[111] 341 P.2d 110 (Or. 1959), *reh'g denied*, 346 P.2d 643 (Or. 1959).

[112] 498 P.2d at 118–19.

[113] *See also Horace Mann Ins. Co. v. Colonial Penn Ins. Co*, 777 P.2d 1162 (Alaska 1989) (reiterating that when one "Other Insurance" Section requires proration and the other requires coverage to be excess, the clauses are in conflict and the court should apply a pro rata calculation to determine liability).

[114] *Werley*, 498 P.2d at 119.

[115] Dkt. 35 at 35–36; Dkt. 39 at 17–18.

[116] 603 P.2d 899 (Alaska 1979).

[117] *Id.* at 903.

The Court agrees with Geico; the facts of this case are akin to those of *Werley* and *Lamb-Weston*, not to those of *Providence*. Neither Umialik's nor Geico's "Other Insurance" provisions state that they should serve as Maier-Sell's primary insurance. Instead, just like in *Werley* and *Lamb-Weston*, one policy is excess and the other applies pro rata.

Since Alaska law considers these policies to be in conflict and requires a pro rata calculation to determine liability, the Court applies a pro rata calculation to determine Geico and Umialik's share of the Ropati and Hunte settlements.[118] Consequently, Umialik must pay Geico $161,666.67 for its overpayment of the Ropati and Hunte settlements, in addition to any prejudgment interest and Alaska Civil Rule 82 attorney's fees.[119]

## V.    CONCLUSION

For the foregoing reasons, Geico's Motion for Summary Judgment, filed at Docket 35 is **GRANTED**, and Umialik's Opposition and Cross Motion for Summary Judgment, filed at Docket 39, is **DENIED.** In light of the holdings of the Order, the parties are **HEREBY ORDERED** to submit a joint status report within **seven days** of the date of this Order detailing the parties' plan for resolution of this matter.

IT IS SO ORDERED.

Dated at Anchorage, Alaska, this 27th day of January, 2023.

/s/ *Timothy M. Burgess*
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE

---

[118] *See Werley*, 498 P.2d at 117–19.

[119] *See, e.g.*, Dkt. 35 at 36–37; Dkt. 42 at 12; *see* Dkt. 53 at 17.